**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| MARIANNE MATCHETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. |
| | ) | |
| MAXIM MEDICAL SERVICES, INC. and | ) | |
| PHILIP A. COWART, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff Marianne Matchette, by counsel, by alleges against Defendants as follows:

1. The plaintiff is Marianne Matchette ("Plaintiff"), a resident of Fort Wayne, Indiana, and an employee of Defendant at all material times to this Complaint.

2. The defendant is Maxim Medical Services, Inc. ("Maxim"), a company doing business at 12628 US-33, P.O. Box 207, Churubusco, IN 46723. At all material times to this Complaint, Defendant was an "employer" for the purposes of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 ("ADA"), and the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140 (hereinafter "ERISA").

3. Philip A. Cowart ("Cowart"), also named as a defendant, is President of Maxim and a resident of Noble County in Laotto, Indiana.

4. At all times herein, Cowart was acting within the scope of his employment as owner and President of Maxim.

1

## COUNTS 1 & 2

### TITLE VII GENDER/HOSTILE WORK ENVIRONMENT, ADA DISCRIMINATION and RETALIATION

5. Plaintiff filed her Charge of Discrimination (EEOC No. 470-2016-00300), on October 27, 2015, a copy of which is attached hereto, incorporated herein, and made a part hereof as Exhibit "A". The EEOC issued its Dismissal and Notice of Rights/Notice of Suit Rights on June 30, 2016 a copy of which is attached hereto and made a part hereof as Exhibit "B". All administrative remedies have been exhausted and all jurisdictional prerequisites have been met for the filing of this lawsuit.

6. Plaintiff was employed by Maxim from on or about March 13, 2014 until her wrongful termination on or about October 7, 2015. She performed within the reasonable expectations of her employer at all material times to this Complaint.

7. Plaintiff was hired as an Executive Assistance to Maxim's President, Cowart, and six (6) other Directors.

8. During Plaintiff's employment, she was continuously subjected to a sexually harassing and hostile working environment.

9. Cowart used his phone and laptop computer to show Plaintiff pictures of women he had purportedly had sex with or planned to have sex with. Cowart would send text messages and photographs to Plaintiff while he was meeting women to have sex and explained to Plaintiff, in detail, his sexual "bucket list." This list included types women that Cowart wanted to have sex with.

2

10. Cowart brought a Go Pro Video recording device into the workplace to show Plaintiff a video that he had recorded of himself and his wife having sex.

11. Cowart's actions subjected Plaintiff to a sexually hostile work environment in violation of Title VII of the Civil Rights Act.

12. On or about September 15, 2015, Plaintiff's husband discovered he had prostate cancer, and Plaintiff informed Cowart of the cancer diagnosis on or about September 29, 2015.

13. On or about October 1, 2015, Cowart spoke with Matchette's husband via the Maxim business line asking him if he had cancer.  During the conversation with Plaintiff's husband, Cowart said, "If you think you are going to have our medical plan pay for your limp dick, you are wrong."

14. Immediately after Cowart became aware of Plaintiff's husband's cancer, and the need for medical treatment under the company medical plan, Plaintiff was treated less favorably than similarly situated individuals whose spouses did not suffer from a serious health condition constituting a disability/perceived disability/record of impairment.

15. On or about September 29, 2015, after Matchette told Cowart that her husband had contracted cancer, Cowart set a plan (the "Plan") in place to cancel Matchette's group health plan coverage.

16. As part of the Plan, on information and belief, in early October 2015, Maxim communicated with its health insurance broker to determine how Maxim could avoid paying for the health care expenses related to Matchette's husband's cancer

treatments. As a result of that communication, Cowart set about to fire Matchette for gross misconduct (which was a necessary requirement to immediately cancel her group health plan coverage without being eligible for COBRA).

17. Cowart had previously terminated an employee, JH, in the summer of 2015 after being advised by Maxim's insurance broker that JH's family health expenses were too costly and the premiums would be lower if JH were no longer employed at Maxim. Matchette was present during these discussions.

18. When Plaintiff was terminated on or about October 7, 2015, the proffered reason she was given was that she had embezzled funds from Maxim and Cowart.

19. Plaintiff alleges that the proffered reason for termination was false and pretextual. In reality, Plaintiff had been discriminated against, retaliated against and terminated on the basis of her husband's serious health condition (prostate cancer) constituting a disability/perceived disability/record of impairment, i.e., disability discrimination by association. Cowart knew that Plaintiff's husband was suffering from cancer and would be utilizing Plaintiff's workplace health insurance. Defendants' actions were in violation of Plaintiff's federally protected rights under the ADA.

20. Alternatively, Plaintiff contends that the proffered reasons for her termination were false and pretextual, and that in reality she was discriminated against, retaliated against, and terminated on the basis of her sex (female), and her knowledge of the sexually hostile working environment that had been created by Cowart, and which was increasing due to Cowart's open and proclaimed use of the dating web site, Tinder, in violation of Plaintiff's federally protected rights under Title VII.

21. Defendants' discriminatory and/or retaliatory conduct was the direct and proximate cause of Plaintiff suffering the loss of her job and job related benefits including income as well as emotional distress, mental anguish, inconvenience, and other damages and injuries.

22. Defendants' discriminatory and/or retaliatory conduct was intentional, knowing, willful, wanton, and in reckless disregard of Plaintiff's federally protected rights under the ADA, Title VII, and the laws and public policies of the State of Indiana. Imposition of punitive damages (where available) is, therefore, appropriate.

WHEREFORE, Plaintiff respectfully prays for judgment against the Defendants for compensatory damages, punitive damages (where available), reasonable attorney's fees and costs, and for all other just and proper relief in the premises.

**COUNT 3**

**ILLEGAL HACKING AND INVASION OF PRIVACY**

23. Plaintiff incorporates herein by reference each of the allegations in Paragraphs 1 through 21 of the Complaint.

24. After Matchette was terminated, without Matchette's knowledge or consent, Cowart, as President of Maxim, unlawfully ordered an IT employee of Maxim, Jake Richhart, to hack into Plaintiff's personal Yahoo account.

25. Pursuant to that order, such IT employee actually broke into Matchette's email account and made available to Maxim/Cowart the personal emails of Matchette and the emails of third parties who had initiated emails to, or answered emails from

5

Matchette.

26. On information and belief, unlawfully accessing Matchette's Yahoo account permitted Cowart and Maxim to further access the Amazon Prime account of Matchette and her husband.

27. On information and belief, Cowart thereafter contacted Amazon directly and caused Amazon to cancel Matchette's Amazon Prime Account, thereby causing damages to Matchette.

28. The conduct described in Paragraphs 23 through 26 above occurred in Allen County, Indiana.

29. Cowart and Maxim's actions as described in Paragraphs 23 through 26 violates I.C. § 35-43-2-3(b).

30. Cowart and Maxim's actions as described in Paragraphs 23 and 24 improperly invades the privacy of Matchette in violation of Indiana law.

31. Cowart and Maxim's conduct as described above has damaged Matchette, including emotional distress and actual damages to be proven at trial.

32. Matchette has been required to hire legal counsel in order to seek legal recourse against Cowart and Maxim for the conduct as described above.

33. Cowart and Maxim's conduct is so outrageous as to warrant the assessment of exemplary and punitive damages.

WHEREFORE, Plaintiff seeks an award of actual damages, punitive damages, reasonable attorneys' fees and such other relief as this court deems appropriate.

6

## COUNT 4

### <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

34. Plaintiff incorporates herein by reference each of the allegations in Paragraphs 1 through 32 of the Complaint.

35. At all times during Matchette's employment at Maxim, Cowart authorized Matchette to use Maxim's credit cards, his own credit cards and Matchette's credit cards for the business of Maxim, for Cowart's personal expenses and some of Matchette's personal expenses.

36. At no time did Matchette use Maxim's credit cards or Cowart's credit cards without express or implicit authorization from Cowart. Nor did Matchette ever seek reimbursement from Maxim for expenses Cowart did not expressly or implicitly approve.

<u>Credit Card Scheme</u>

37. Very early on in Matchette's employment with Maxim she observed that both Maxim and Cowart would reach the limits of available credit on their credit cards.

38. During her employment, Matchette observed that Cowart had a scheme to reduce credit card debt of both Cowart and Maxim. Specifically, Cowart would routinely execute false affidavits to American Express and other credit card companies claiming that expenses Maxim incurred in its business were not authorized in order that Maxim could receive additional credit authority. Cowart told Matchette that these affidavits, although false, were necessary for Maxim to be able to continue charging up more expenses.

7

39. Matchette is informed and believes that even though the debt incurred by Maxim and Cowart was incurred as ordinary expenses of Maxim and Cowart, American Express and other credit card companies wrote off thousands of dollars of Maxim's and Cowart's credit card debt based upon Cowart's false affidavits.

40. Cowart knew that he could not deduct his personal living, travel and entertainment expenses directly from Maxim. As a result, he directed Matchette to pay for many of those expenses with her credit cards and then obtain reimbursement from Maxim. For example, before Cowart traveled to Thailand in December 2014, he directed Matchette to buy expensive perfume and purses for at least four (4) of his "Tinder girls" he was planning to have sexual relationships with in Thailand. Matchette charged several hundred dollars for these items on her credit cards and then sought and obtained reimbursement from Maxim. Matchette is informed and believes Cowart is claiming those items were for Matchette's benefit, not his.

41. Over the course of her employment, Matchette charged tens of thousands of dollars on her credit cards that were reimbursed by Maxim as directed by Cowart.

Cowart's Divorce Scheme

42. In November of 2014, Cowart met with Matchette to discuss his pending divorce and told her he needed to keep his (A) Star Bank HSA, checking and savings accounts and (B) Three Rivers Credit Union checking and savings accounts (collectively, "Cowart's Accounts") as low as possible until after the divorce was concluded so his wife would not get at those funds. He directed Matchette to spend money from those accounts for her own benefit and to keep track of those

expenditures.

43. Matchette did as Cowart directed in Paragraph 42 and charged personal expenses against his bank accounts and maintained a running total of those expenses in a file on her Maxim computer (the "Bank Account Reconciliation").

44. Unless Cowart and Maxim have deleted the Bank Account Reconciliation file, evidence of all of Matchette's personal expenses that she paid from Cowart's Accounts are in Maxim's care, custody and control.

45. Matchette and Cowart agreed that an acceptable arrangement would be worked out concerning her personal expenses paid from Cowart's Accounts when his divorce was final. Based on information and belief, Cowart's divorce is not final.

Cowart's Personal Expenses Paid by Maxim

46. Cowart directed Matchette to purchase furniture, clothes, towels, paper products, food, toys and other items for Cowart and his children and then seek reimbursement from Maxim, which Matchette did.

47. During Matchette's employment, Cowart would find products on the Internet, Matchette would purchase them and have them delivered to her home. Once received, either an employee of Maxim or Matchette or her husband would deliver the products to Cowart's home.

48. Matchette purchased thousands of dollars of personal items for Cowart and his family this way and was then reimbursed by Maxim.

Cowart was Generous to Matchette's Family<br>Before Matchette's Husband Developed Cancer

49. Prior to Cowart becoming aware of Plaintiff's husband's cancer diagnosis, Cowart

was generous to Matchette's family as evidenced by the examples set forth in Paragraphs 50 through 52.

50. In December of 2014, instead of giving her a bonus to recognize her work for Maxim and Cowart, Cowart told Matchette to take a fully paid vacation with her husband using Cowart's time share at his expense since there was no money in Maxim for an annual bonus. With Cowart's consent, the Matchettes vacationed in Antigua in July 2015.

51. In July 2015, Cowart was with Matchette at Cunningham Optical when he picked out an expensive pair of eye glasses ($1,095) for Matchette to buy on Maxim's account.

52. In approximately April 2015, while in the Maxim office, Cowart told Matchette that she should make a significant payment for her daughter's baby/nursery furniture at Maxim's expense, which she did.

<u>Oppressive Conduct by Cowart after the Cancer Notice</u>

53. As part of a plan to harm Matchette, Cowart decided to charge Matchette for all expenses Matchette submitted to Maxim for payment or reimbursement during her employment, whether for Cowart, Cowart's family, Matchette, Matchette's family, or Maxim.

54. On information and belief, these expenses totaled approximately $155,000.00, the vast majority of which were for the benefit of Maxim or Cowart or Cowart's family members.

55. On October 6, 2016, Cowart met Matchette at a restaurant, at which time he fired her, but did not give her a termination letter. He told her to meet him at his attorney's office later that day if she didn't want to be arrested or have the police involved.

56. Matchette went to Cowart's attorney office. While she was there, she was threatened with jail by Cowart and his attorney unless she signed an affidavit admitting to things that she did not do. She asked questions about the terms of the affidavit which resulted in changes to it. Cowart actually had a police officer come into the room in an effort to further intimidate her unless she signed a false statement.

57. Matchette met with the police officer in his squad car and gave him a statement.

58. Matchette returned from the squad car to the front of the Beckman Lawson office building. The police officer went inside and then came out of the building to hand her an information card. Because she was not being arrested, as Cowart had threatened, Matchette began walking toward her car when Maxim's lawyer approached her and again told her to sign the affidavit. He told her if she signed it she would not be arrested, he would keep Cowart under control, and this would all be over. Matchette believed the discussions would be kept private.

59. Matchette asked if she could take the statement home and review it with an attorney, but Cowart's attorney told her she needed to "sign it now."

60. After all of the coercive and threatening tactics used by Cowart and his attorney during that day, she felt compelled to sign the affidavit, even though it was not

11

accurate. Her stress was further compounded by her husband's recent cancer diagnosis and the fact that he was in California, so she was alone. She went inside, signed the affidavit and handed it back to Cowart's attorney, who said, "Now Phil owns you."

61. Unbeknownst to Matchette, Cowart tape recorded the entire day's events including the restaurant meeting and at all times while Cowart was with Matchette at the attorney's office.

62. Unless Cowart destroyed portions of the tape recording he made, all the discussions between Matchette and Cowart, or Matchette and Cowart's attorney are on the tape, which recordings would exonerate Matchette.

63. Matchette did not consent to Cowart's surreptitious tape recordings that day and fully expected her conversations with Cowart and his lawyer would be kept private. Matchette is informed and believes Cowart's purpose in tape recording Matchette was to injure Matchette and to publicly embarrass Matchette.

64. On October 9, 2016, Cowart and Matchette's husband had a phone conversation which Plaintiff believes Cowart may have tape recorded.

Cowart's False Affidavits

65. In an attempt to recover approximately $155,000.00 in expenses (most of which were incurred as normal business expenses of Maxim), on or about October 23, 2015, Cowart signed a false affidavit to Westfield Insurance Company (the "False Insurance Affidavit") claiming Matchette engaged in "credit card fraud, bank fraud and check fraud" in the amount of approximately $155,000.00 (Attached

Exhibit C) As is evident from the False Insurance Affidavit, there is no specificity in the Claim so Matchette was unable to understand the basis for the claim.

66. Upon receipt of the Westfield Insurance claim, Matchette asked to review the supporting documentation Cowart gave to Westfield to justify the Claim so she could correct inaccuracies in the claim. Matchette was aware that Cowart would routinely file false claims against American Express and other credit card companies.

67. The Westfield Insurance Company refused to give Matchette any documentation to support Cowart's claim, but, on information and belief, did engage a forensic accountant to review it.

68. On information and belief, the forensic accountant found that more than $60,000 of the claim was unsupported and not justified.

69. On information and belief, Cowart has given false statements to police and federal prosecutors regarding Matchette's activities while employed at Maxim in order to justify his fraudulent expenditures for his lavish lifestyle.

70. On information and belief, Cowart has knowingly and falsely accused Matchette of stealing approximately $155,000.00 from Maxim and him.

71. On information and belief, Cowart had previously charged his brother and his father with taking Maxim's money in much the same way as he now claims Matchette did.

<u>Cowart's Other Intentional Misconduct</u>

72. Since Matchette's firing, Cowart has engaged in a pattern of extreme and

13

outrageous intentional misconduct against Matchette that includes the following:

A.     Inducing Cunningham Optical, Matchette's eye care store, to stop doing business with Matchette and her husband.

B.     Attempting to induce Parkview Hospital from employing Matchette by saying, among other things, that she would cost a ton of money for health insurance.

C.     Playing portions of the surreptitious tape recordings to non-employees of Maxim in order to publically embarrass Matchette and to injure her reputation in the community.

D.     Sending vicious texts and communications to Matchette's husband that describe Matchette's daughters as "pathetic" and state that Cowart would rather "stick a hot soldering iron in my (Cowart's) eye than be married to [Matchette]."

E.     Induced Matchette's mortgage bank not to approve her loan for her mortgage.

73. Cowart has engaged in the intentional misconduct as described above in order to cause Matchette severe emotional distress.

74. As a direct and proximate result of Cowart's intentional misconduct from and after October 6, 2015 as described above, Matchette has had to seek medical treatment.

WHEREFORE, Plaintiff seeks an award of actual and compensatory damages, punitive damages, reasonable attorney's fees and such other relief as this court deems appropriate.

## Count 5

## Conversion and Unjust Enrichment

75. Plaintiff incorporates herein by reference each of the allegations in Paragraphs 1 through 73 of the Complaint.

76. On or about March 2016, Maxim caused Matchette's Capital One, GM, Credit One credit cards and Merrick Bank to charge back approximately $35,000.00 in expenses without Matchette's knowledge or consent, many of which were

14

expenses of Cowart and/or Maxim.

77. As a direct and proximate result of Maxim's actions as described in Paragraph 75, Matchette is obligated to pay back approximately $35,000.00.

78. The amount back charged far exceeds the amount Matchette would otherwise owe Cowart or Maxim with respect to the Bank Account Reconciliation or otherwise and includes several thousands of dollars that Matchette paid in the normal course of business for Maxim.

79. Matchette followed Maxim's normal protocols when submitting such expenses for reimbursement and was reimbursed for those expenses.

80. By Maxim's conduct as described in Paragraph 76, Maxim and Cowart have wrongfully converted Matchette's money to Maxim/Cowart's own use. Further, both Maxim and Cowart have been unjustly enriched by the actions described in Paragraph 76.

81. In accordance with I.C. 34-24-3-1, due to Maxim/Cowart's wrongful conversion of Matchette's property, Matchette is entitled to treble damages and reasonable attorney's fees in pursuing this claim.

WHEREFORE, Matchette seeks an award of actual damages, treble damages, reasonable attorney's fees and such other relief as this court deems appropriate.

15

**Count 6**

**ERISA § 510**

82. Alternatively, Matchette further alleges that her termination was in retaliation and an effort to punish Matchette for use of healthcare benefits and to interfere with her rights to future employee benefits for her husband's healthcare in violation of ERISA § 510.

83. The Defendants' discriminatory and/or retaliatory conduct was the direct and proximate cause of the Plaintiff suffering the loss of her job and job related benefits including income as well as emotional distress, mental anguish, inconvenience, and other damages and injuries.

84. The Defendants' discriminatory and/or retaliatory conduct, furthermore, was intentional, knowing, willful, wanton, and in reckless disregard of the Plaintiff's federally protected rights under the ADA and ERISA.

WHEREFORE, Plaintiff respectfully prays for judgment against the Defendants for lost wages, compensatory damages, punitive damages, reasonable attorney's fees and costs, and for all other just and proper equitable relief available, including reinstatement and back pay, in the premises.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully submitted,

**CHRISTOPHER C. MYERS & ASSOCIATES**


/s/ Lori W. Jansen
Christopher C. Myers, #10043-02
Lori W. Jansen, # 19417-57
David W. Frank, #31615-02
Skyler Spurling-Newsome, #33833-02
809 South Calhoun Street, Suite 400
Fort Wayne, IN 46802
Telephone:    (260) 424-0600
Facsimile:    (260) 424-0712
Attorneys for Plaintiff

17